1

2

3

4                                                    **E-FILED on 11/19/2012**

5

6

7

8                 IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                          SAN JOSE DIVISION

11

12   REGINALD JEFFERIES,                   No. C-09-01058 RMW

13              Petitioner,

                                           ORDER DENYING PETITION FOR WRIT
14        v.                               OF HABEAS CORPUS AND DENYING
                                           CERTIFICATE OF APPEALABILITY
15   ANTHONY HEDGPETH, Warden,
                                           **[Re Docket No. 1, 4]**
16              Respondent.

17

18

19        Reginald Jefferies petitions for a writ of habeas corpus under 28 U.S.C. § 2254.  For the

20   reasons set forth below, the petition for writ of habeas corpus is denied.

21                          **I.  BACKGROUND**

22        In 2002, the decedent, Louis James Esclavon was living in the upper unit of a duplex on

23   Saklan Road with his girlfriend, Sandy Van Dusen, his close friend Jay Jefferies,[1] who was

24   petitioner's brother, and Bernadette Carter, the mother of Jefferies and petitioner.  *People v.*

25   *Jefferies*, No. A113198, 2007 WL 2852571, at *2 (Cal. Ct. App. Oct. 3, 2007).  Esclavon and Van

26   Dusen paid rent to Jefferies and slept on the floor in the living room.  *Id.*  Esclavon's close friend

27   _____

28   [1]  To avoid confusion, Jay Jefferies will be referred to as "Jefferies" and Reginald
     Jefferies as "petitioner" in this order.

     ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY—No.
     C-09-01058 RMW
     GS

*United States District Court*
*For the Northern District of California*

United States District Court
For the Northern District of California

Lyndee Theado[2] spent a lot of time with him and was also friends with Van Dusen, Jefferies, and Carter. *Id.* Van Dusen and Theado both met petitioner for the first time in late 2002 and saw him occasionally after that. *Id.* Esclavon would buy crack cocaine from Jefferies and sometimes did odd jobs for Jefferies in exchange for the drug, which he smoked with Van Dusen and Theado. *Id.*

In mid-January 2003, Jefferies became sick, fell into a coma, and was hospitalized. *Id.* at *3. Carter and petitioner's sister Norma refused to permit Esclavon and Van Dusen in the apartment. *Id.* Esclavon, Van Dusen, and Theado began to stay in Jefferies's van, Theado's van, or motels. *Id.*

On January 30, 2003, Esclavon, Van Dusen and Theado used crack cocaine together throughout the day, then slept in Theado's van, parked across the street from Jefferies's apartment. *Id.* The next day, they were in the van waiting for Van Dusen's social security check to come in the mail to the apartment. *Id.* A friend, Brian, came by to visit, sitting in the front passenger seat while Esclavon sat in the driver's seat, with Theado and Van Dusen in the back of the van. *Id.* Carter came to the car and had a conversation with Esclavon through the passenger side window. *Id.* She wanted money Esclavon owed to Jefferies. *Id.* Esclavon said he would pay her when the mail arrived. *Id.* According to Theado, they disagreed on the amount owed, Esclavon agreed to pay the full amount Carter wanted until Jefferies got out of the hospital, and Carter went back to the apartment across the street. *Id.*

Both Theado and Van Dusen testified that a few minutes after Carter left, petitioner opened the van door, pointed a long barrel gun at Esclavon, and shot him. *Id.* They both also saw petitioner drive off in a Corolla owned by Jefferies. *Id.*

Michael Sweigart, who was living in the lower unit of a duplex on Saklan Road, also testified against petitioner at trial. Sweigart had just returned from prison, where he had served time for a second degree robbery conviction. *Id.* Sweigart knew petitioner because they had

---

[2] Lyndee Theado, formerly Lyndee Bumcrot, had married between the time of the shooting and trial.

been in juvenile hall together for several months in about 1997 to 1998, but he did not know the other people who lived upstairs. *Id.*

According to Sweigart, he was outside the house at his brother's car on the afternoon of January 31, trying to fix the stereo wires in the trunk. *Id.* Hearing a door open, he looked up and saw petitioner coming down the stairs from the upper flat. *Id.* Shortly afterwards, Sweigart heard a gunshot and saw petitioner running back towards the house. *Id.* He saw petitioner tuck a gun into his pants, run up the stairs to his apartment, then after a few seconds, run down the stairs and toward Winton Avenue. *Id.* The woman Sweigart always saw with Esclavon was screaming and Sweigart ran into the house to get his brother because, being on parole, he did not want to be there when the police arrived. *Id.*

Sweigart and his brother left and were soon pulled over by the police. *Id.* A woman the police brought to the scene said neither Sweigart nor his brother was the shooter. *Id.* Sweigart and his brother were taken to the sheriff's department for questioning. *Id.* Sweigart told the police he had seen "Reg" running up the street wearing a black hoody and saw him tuck a gun into his waistband. *Id.* Later, Sweigart was shown a photographic lineup that included petitioner but did not identify him because he did not want to get involved. *Id.* At trial, Sweigart testified that he told the police many lies because he did not want to get involved or tell on petitioner. *Id.*

In June 2003, Sweigart was arrested on a rape charge and housed in the same area of the Santa Rita jail as petitioner. *Id.* at *5. Sweigart was not worried about the statement he had given the police in January because he hadn't identified petitioner. *Id.* He became concerned, however, when inmates began to refer to him as a snitch. *Id.* Sweigart was moved to a different area of the jail until he was transferred to prison. *Id.* When Sweigart was transported to the Santa Rita jail to give testimony at petitioner's trial, there was an order to keep him separate from petitioner. *Id.* Sweigart testified that the prosecutor promised him that if he testified, he might be moved out of state for his safety. *Id.*

At trial, petitioner's defense was primarily that he was mistakenly identified and Sweigart was really the killer. *Id.* at *8. To discredit Sweigart, the defense produced Marland Wade, who was in custody on a parole violation at the time of trial, had known Michael Sweigart since 1991,

United States District Court
For the Northern District of California

1    lived in the same neighborhood and went to high school with him, and had dated his aunt.  *Id.* at

2    *6.

3        In November 2004, Wade was in custody with Sweigart, who bragged about having gotten

4    away with a murder in 2003.  *Id.*  Wade testified that Sweigart said he had gotten into a

5    confrontation outside an apartment complex in Hayward with a man who was verbally threatening

6    him, he and his cousin decided to kill the man, and Sweigart hit the man in the head with a pistol

7    before shooting him.  *Id.*  Sweigart and his cousin were then pulled over by the police and

8    arrested.  *Id.*  Sweigart told Wade that "Reggie" had been blamed for the murder, indicating this

9    was someone from their neighborhood, but Wade did not know who he was talking about.  *Id.*

10       Wade met petitioner for the first time in jail about two weeks before trial.  *Id.*  Wade

11   asked him about the situation, and petitioner asked Wade to talk to his attorney.  *Id.*  Wade

12   discussed Sweigart's story with petitioner's defense counsel five days before his testimony at trial,

13   having never previously told anyone about it.  *Id.*  Wade testified that he was concerned about

14   petitioner being blamed for a crime he didn't commit, he never discussed the events of January 31

15   with petitioner, and he believed Sweigart had told him the truth.  *Id.*  Wade had known

16   petitioner's brother-in-law, Ascari Amin, all his life, but testified he did not know Amin was

17   married to petitioner's sister.  *Id.*

18       In November 2004, Wade and Sweigart belonged to a prison organization called "KUMI,"

19   although Wade was no longer a member at the time of trial.  *Id.*  A person labeled a "snitch"

20   would be beaten up or expelled from the organization.  *Id.*  Wade denied that he was implicating

21   Sweigart in the murder as punishment for being a snitch.  *Id.*  Wade denied knowing that

22   Sweigart had testified against petitioner just before Wade gave his information to the defense, and

23   denied knowing Sweigart had been labeled a snitch or expelled from KUMI for being a snitch.

24   *Id.*

25       On November 30, 2005, petitioner was convicted by a jury in Alameda County superior

26   Court of murder in the first degree murder (Cal. Pen.Code § 187(a)).  (Clerk's Transcript ("CT")

27   at 346-358.)  The jury also found true enhancement allegations that petitioner discharged a

28   firearm causing great bodily harm and death (Cal. Pen.Code § 12022.53(d)).  *Id.*  The trial court

held that a prior carjacking conviction constituted a strike under sections 667, subdivision (e)(1), and 1170.12. *Id.* at 348-351.  On March 8, 2006, the trial court exercised its discretion to strike the prior conviction and sentenced petitioner to a total prison term of 50 years to life. *Id.* at 355. On October 3, 2007, the California Court of Appeal reversed the finding that his prior juvenile offense constituted a strike but otherwise affirmed the judgment.  On December 12, 2007, the California Supreme Court denied review.

Petitioner filed the instant petition on March 11, 2009, raising the same challenges to his conviction as those raised on direct appeal.  Respondent filed an answer on December 10, 2010. Petitioner filed a traverse on June 13, 2011.

## II. ANALYSIS

### A.    Legal Standard

A court may grant a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).  The court may grant the writ only if the state court's ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

For a state court's decision to be contrary to clearly established federal law, it must apply a rule that contradicts the governing law set forth in Supreme Court cases, or confront a set of facts that are materially indistinguishable from a Court decision and nevertheless arrive at a different result from Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002).  A state court decision is an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  The court cannot grant a habeas petition as being an "unreasonable application" of federal law merely because, in its opinion, the law was incorrectly applied in a case. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). Rather, the state court's application of federal law must be "objectively unreasonable" in order to

**United States District Court**
For the Northern District of California

justify granting the petition. *Id.* The review of state court decisions is highly deferential, and state court decisions should be given the benefit of the doubt. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

### B.   Petitioner's Claims

Petitioner states two grounds for federal habeas relief. First, petitioner claims his rights under the Fifth, Sixth, and Fourteenth Amendments were violated by a supplemental jury instruction that diluted the burden of proof regarding the key elements of premeditation and deliberation. Second, petitioner claims his Fifth and Fourteenth Amendment due process rights were violated by prosecutorial misconduct when the prosecutor's closing argument urged the jury to solve social problems by finding petitioner guilty, argued that petitioner did not deserve due process or fair treatment, misstated the law, and attacked defense counsel.

### 1.  Supplemental Jury Instruction 8.20s

Petitioner argues that the trial court erred in providing supplemental jury instruction 8.20s, which petitioner contends lightened the prosecution's burden of proof on the elements of premeditation and deliberation for first degree murder and consequently violated his constitutional right to due process and the right not to be found guilty unless proven beyond a reasonable doubt. (Pet. 8; Pet'r Mem. P. & A. 15-16.) The trial court instructed the jury with model CALJIC 8.20, which sets forth the elements of first degree murder based on premeditation and deliberation as follows:

> All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree. . . . The word "deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word "premeditated" means considered beforehand. [¶] If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree. [¶] The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. [¶] The true test is not the duration of time, by rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree. [¶] To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing

United States District Court
For the Northern District of California

1   and the reasons for and against such a choice and, having in mind the consequences,
2   [he] decides to and does kill.

(CT at 267.) The trial court also gave supplemental instruction 8.20s: "To prove the killing was
3   'deliberate and premeditated,' it is not necessary to prove the defendant maturely and meaningfully
4   reflected upon the gravity of his act." CT at 268. As the California Court of Appeal recognized, the
5   language in the supplemental instruction is virtually identical to the fourth paragraph of California
6   Penal Code section 189, with the exception that the trial court replaced the language "it shall not be"
7   with "it is not". *People v. Jefferies*, No. A113198, 2007 WL 2852571, at *6, n.5.

8       At trial, the defense objected that the supplemental instruction undermined CALJIC 8.20
9   which, by itself, was a correct and sufficient statement of the law. The trial court overruled the
10  objection, explaining that it was supposed to instruct the jury on all applicable law, the Legislature had
11  included the supplemental language in its definition of the offense, and it was not "precisely duplicative
12  of the instruction previously given." *People v. Jefferies*, No. A113198, 2007 WL 2852571, at *7.

13      To challenge a jury instruction on habeas, a petitioner must prove that the ailing instruction
14  so infected the entire trial that the resulting conviction violates due process. *Spivey v. Rocha*, 194
15  F.3d 971, 976 (9th Cir. 1999), citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). "The instruction
16  must be viewed in the context of the entire trial and the jury instructions taken as a whole." *Id.* A
17  jury instruction that relieves the prosecution of the burden of proving an element of the crime violates
18  a defendant's right to due process. *See In re Winship*, 397 U.S. 358, 364 (1970); *see also Sandstrom
19  v. Montana*, 442 U.S. 510, 520-21 (1979). When challenging an ambiguous or confusing jury
20  instruction, a petitioner must establish a reasonable likelihood that the jury applied the challenged
21  instruction in a way that violates the Constitution. *Estelle*, 502 U.S. at 72. This standard requires
22  a petitioner to demonstrate more than a possibility that jurors misunderstood the instructions. *See
23  Weeks v. Angelone*, 528 U.S. 225, 236 (2000). Petitioner must demonstrate that there is a reasonable
24  likelihood the jury applied the given instructions in such a way as to relieve the prosecution of its
25  burden of proving premeditation and deliberation with respect to the murder of Louis Esclavon.

26      In *People v. Smithey*, 20 Cal.4th 936, 980-982 (1999), the California Supreme Court held that
27  modifying CALJIC No. 8.20 to include the language challenged here was not error because "[t]he

28

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY—No.
C-09-01058 RMW
GS                                                          7

language of a statute is generally an appropriate and desirable basis for an instruction" and "[t]he instruction made clear that reflection must have preceded commission of the crime and could not have been unconsidered or rash, but rather must have resulted from careful thought and a weighing for and against the chosen course of action." *Id.* at 981.  Petitioner argues that *Smithey* is distinguishable because the defendant in that case had relied upon a diminished capacity defense and there were no witnesses to the crime, whereas witness testimony at petitioner's trial suggested that the killing could have been the result of an impulsive, unconsidered attack.  (Pet'r Reply Mem. P. & A. 4-5.)  But this case presents the same issue as *Smithey*, and as in that case, the jury could not have been led to believe that first degree murder could be found based only on the commission of the act, without finding that the shooting was premeditated and deliberate.

There is no reasonable likelihood that the supplemental jury instruction would have led a juror to believe he or she could find first degree murder based only on the defendant's commission of the act, nor is there a conflict between CALJIC 8.20 and the supplemental jury instruction.  CALJIC 8.20 makes clear that reflection must precede commission of the crime and cannot be rash, but rather must result from careful thought and a weighing for and against the chosen course of action.  A person may "weigh and consider the question of killing and the reasons for and against such a choice . . . having in mind the consequences" before he decided to kill; at the same time, he may not "maturely or meaningfully" think deeply about the gravity of the killing.  He can "carefully" but not "maturely or meaningfully" form the intent to kill.  Supplemental instruction 8.20s could not reasonably have been taken by the jury to mean in the context of the instant case that a sudden, impulsive, and unconsidered killing could be viewed as premeditated and deliberate.  Therefore, the jury instruction taken as a whole was not ambiguous or erroneous, and there is no reasonable likelihood that the jury applied the jury instructions set forth above in such a way as to relieve the prosecution of its burden of proving premeditation and deliberation.

Petitioner also argues that the prosecutor's comment likening the premeditation and deliberation required for first degree murder to the decision a driver makes when he swerves to avoid a collision furthered the likelihood of confusion created by supplemental instruction 8.20s because such an action is an instinctual response. (Pet'r Mem. P. & A. 3.)  The prosecutor argued:

You can go left into a guardrail, you can go straight and strike that car, or you can go right, that is, to the side of the road, where you can stop your car safely. And you opt to go right. [¶] That's premeditation and deliberation. *You weighed the consequences*, albeit you did this quickly; you weighed them: If I went left, if I go straight, if I go right, and you go right. *You thought about it* and you did what you needed to do. [¶] The main thing when we talk about premeditation is that you understand we're not talking about a situation where you sit down and you write out all the pros and cons, you write out a list, and then you go out and decide to kill. That's not what it means. The law does not require it to be a good judgment or a rational judgment. It never is.

(RT vol. 7, 1179-1180 (emphasis added).) Taken as a whole, the prosecutor's scenario involves a brief consideration of the choices and not an instinctual response. It is not reasonably likely that a juror would understand this argument to mean that premeditation and deliberation could be found without a weighing of the consequences.

Accordingly, the state court's denial of petitioner's claim that the trial court erred by instructing the jury with supplemental jury instruction 8.20s was not contrary to or an unreasonable application of clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts. Petitioner is not entitled to federal habeas relief on this claim.

## 2. Prosecutorial Misconduct

Petitioner next contends that the prosecutor committed prosecutorial misconduct by urging the jury to solve social problems by finding petitioner guilty, arguing that petitioner did not deserve due process and fair treatment from the jury because of his crime, misstating the law concerning premeditation and deliberation, and attacking defense counsel. (Pet'r Mem. P. & A. 4-7.)

Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *See id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir.2005).

1    The California Court of Appeal found that petitioner had failed to object to most of the

2  comments he now challenges, and when he did object he failed to request an admonition. *People v.*

3  *Jefferies*, No. A113198, 2007 WL 2852571, at *10.  Petitioner does not offer a reason for his failure

4  to object or request admonition or otherwise address the California appellate court's finding.  He

5  contends that absent the alleged conduct, it is likely the jury would have either failed to convict

6  petitioner or found petitioner guilty of a lesser crime.  (Pet'r Mem. P. & A. 8.)

7    A claim is procedurally defaulted for federal habeas corpus purposes if the opinion of the last

8  state court rendering judgment in the case declined to reach the issue for procedural reasons, or "if

9  it is clear that the state court would hold the claim procedurally barred." *Harris v. Reed*, 489 U.S.

10  255, 263 (1989).  Further, "the application of the state procedural rule must provide 'an adequate and

11  independent state law basis' on which the state court can deny relief." *Park v. California*, 202 F.3d

12  1146, 1151 (9th Cir. 2000).  Claims not properly raised at trial are procedurally defaulted and may

13  not be considered on federal habeas corpus absent a showing of cause for the default and resulting

14  prejudice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Bonin v. Calderon*, 59 F.3d 815, 842-43

15  (9th Cir. 1995); *see Davis v. Woodford*, 384 F.3d 628, 654 (9th Cir. 2004) (claim procedurally

16  defaulted where no constitutional objection was raised at trial).  Failure to object to prosecutorial

17  misconduct in a closing argument constitutes a valid procedural default under California's

18  contemporaneous objection requirement. *Featherstone v. Estelle*, 948 F.2d 1497, 1506 (9th Cir.

19  1991).

20    The California Court of Appeal was the last state court to render a reasoned opinion in this

21  case.  In its opinion, the court concluded that "appellant waived his challenge to the remarks he cites

22  as examples of misconduct: Nothing in the record suggests objections or requests for admonitions

23  would have been futile, and none of the comments was so egregious that an admonition could not

24  have cured the harm." *People v. Jefferies*, No. A113198, 2007 WL 2852571, at *11.  It is clear that

25  the court considered the claims procedurally barred.  Because the procedural rule relied upon by the

26  California appellate court is "independent" for purposes of procedural default, and because petitioner

27  has not placed the rule's "adequacy" at issue, the court concludes that these claims are procedurally

28  defaulted for the purposes of federal habeas review.

**United States District Court**
For the Northern District of California

State court prisoners can under limited circumstances obtain federal habeas review of procedurally defaulted claims by demonstrating cause for the default and actual prejudice as a result of the alleged violation of federal law, or by demonstrating that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. at 729-30. To prove a fundamental miscarriage of justice, petitioner must show that a constitutional violation probably resulted in his conviction despite his actual innocence. *See Schlup v. Delo*, 513 U.S. 298, 321–25 (1995) (linking miscarriages of justice to actual innocence); *United States v. Olano*, 507 U.S. 725 (1993) ("In our collateral-review jurisprudence, the term 'miscarriage of justice' means that the defendant is actually innocent."); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."). Although at the gateway stage the petitioner need not establish his innocence as an "absolute certainty," petitioner must demonstrate that more likely than not, no reasonable juror could find him guilty beyond a reasonable doubt. *House v. Bell*, 547 U.S. 518, 538 (2006).

Petitioner claims that he was prejudiced, and without the alleged violations of federal law, "a reasonable juror could have found a reasonable doubt of petitioner's guilt." (Pet. 9.) Petitioner further asserts that without the prosecutor's alleged misconduct "it is likely that the jury would have either failed to convict petitioner or failed to have found petitioner guilty of premeditated and deliberated first degree murder." (Pet'r Mem. P. & A. 8.) Despite petitioner's assertions, however, he demonstrates neither cause for the default nor actual prejudice as a result of the alleged violation of federal law. Therefore, for the court to review petitioner's claims, he must demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. Petitioner submits no evidence and makes no argument supporting this position outside the conclusory assertion that a jury likely would have failed to convict. Because more than sufficient evidence existed in the trial record to support petitioner's conviction of first degree murder, and because petitioner has not offered any

1  evidence contradicting the evidence admitted at trial, the court rejects his assertion that there has been

2  a fundamental miscarriage of justice.  Accordingly, the court is barred from reviewing this claim.[3]

3  <center>**IV. CONCLUSION**</center>

4  For the foregoing reasons, the petition for writ of habeas corpus is DENIED.  The clerk

5  shall enter judgment and close the file.

6  <center>**V.  CERTIFICATE OF APPEALABILITY**</center>

7  The federal rules governing habeas cases brought by state prisoners require a district court

8  that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling.

9  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. § 2254 (effective December 1, 2009).

10  For the reasons set out in the discussion above, petitioner has not shown "that jurists of reason

11  would find it debatable whether the petition states a valid claim of the denial of a constitutional

12  right [or] that jurists of reason would find it debatable whether the district court was correct in its

13  procedural ruling."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a COA is

14  DENIED.

15

16  DATED:    November 19, 2012

*Ronald M. Whyte*

17  RONALD M. WHYTE
United States District Judge

18

19

20

21

22

23

24

25

26

27  [3] Petitioner's primary argument at trial was misidentification, not lack of premeditation.  In fact,
counsel made minimal argument about premeditation.  Even if petitioner's allegation of prosecutorial

28  misconduct were not procedurally barred, petitioner fails to make a showing of prejudice.